```
 1  BENJAMIN B. WAGNER
    United States Attorney
 2  MARY L. GRAD
    Assistant U.S. Attorney
 3  501 I Street, Suite 10-100
    Sacramento, California 95814
 4  Telephone: (916) 554-2763
 5
 6
 7                IN THE UNITED STATES DISTRICT COURT
 8              FOR THE EASTERN DISTRICT OF CALIFORNIA
 9
10  UNITED STATES OF AMERICA,    )   Case No. CR-S-99-270-WBS
                                 )
11            Plaintiff,         )
                                 )   FINDINGS OF FACT AND
12       v.                      )   CONCLUSIONS OF LAW FOLLOWING
                                 )   EVIDENTIARY HEARING
13  FRANCISCO ACOSTA ASTORGA,    )
                                 )
14                               )
                                 )
15                               )
         Defendant and Movant.   )
16  _____)
```

17      The attached reporter's transcript dated October 23, 2009

18 constitutes the court's findings of fact and conclusions of law

19 following the evidentiary hearing on defendant/movant's motion to

20 vacate judgment under 28 U.S.C. §2255 or alternatively under 28

21 U.S.C. § 1651.  Both motions are denied for the reasons set forth in

22 the attached transcript.

23 SO ORDERED.

24 Dated: December 3, 2009

25

26                              _____
                                WILLIAM B. SHUBB
27                              UNITED STATES DISTRICT JUDGE

28

1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

---oOo---

BEFORE THE HONORABLE WILLIAM B. SHUBB, JUDGE

---oOo---

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                No. CR. S-99-270

FRANCISCO ACOSTA ASTORGA,

        Defendant.

_____/

---oOo---

REPORTER'S PARTIAL TRANSCRIPT

EVIDENTIARY HEARING

FINDINGS OF FACT AND CONCLUSIONS OF LAW

FRIDAY, OCTOBER 23, 2009

---oOo---

Reported by:    KATHY L. SWINHART, CSR #10150

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

```
 1                        APPEARANCES
 2
 3   For the Plaintiff:
 4        LAWRENCE G. BROWN
          Acting United States Attorney
 5        501 I Street, Suite 10-100
          Sacramento, California  95814
 6        BY:    MARY GRAD
                 Assistant U.S. Attorney
 7
 8   For the Defendant:
 9        BLACKMON & ASSOCIATES
          813 Sixth Street, Suite 450
10        Sacramento, California  95814
          BY:    CLYDE M. BLACKMON
11
                 and
12
          JAMES FRANK SMITH
13        Post Office Box 72451
          Davis, California  95616
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    SACRAMENTO, CALIFORNIA

 2              FRIDAY, OCTOBER 23, 2009, 11:22 A.M.

 3                            ---oOo---

 4              (Proceedings reported, not transcribed.)

 5            THE COURT:  All right.  The Court has reviewed the

 6   matters submitted, and I am going to make my findings of fact

 7   and conclusions of law orally on the record here in open court

 8   at this time.  The following remarks will constitute my

 9   findings of fact and conclusions of law in this matter.

10            When I instruct a jury as to credibility of witnesses,

11   I tell them words to the effect that they can believe all of

12   what a witness says, part of it or none of it, and it is for

13   them to decide what credibility to give to the testimony of

14   any witness.  I tell them the factors that they can take into

15   account in determining whether to believe what a witness says

16   or not.  And I tell them they may take into account such

17   things as the witness's demeanor while testifying, the manner

18   in which the witness may be affected by the verdict, the

19   extent to which the witness's testimony is contradicted by the

20   testimony of other witnesses, whether the witness's testimony

21   is reasonable in light of all the other evidence in the case,

22   and any other factor that may bear upon credibility.

23            I apply those same guidelines in deciding the

24   testimony to believe in this case.

25            In summary, the Court does not believe the testimony
```

1  of Mr. Acosta Astorga, nor the testimony of Diana Garcia.
2  Simply put, Mr. Astorga is the witness most affected by the
3  verdict in this case. I was not impressed with his demeanor
4  as he testified. His testimony was contradicted by what he
5  said to me here in court face to face when I looked him in the
6  eye and took his plea. And most importantly his testimony was
7  not reasonable in light of common experience or in light of
8  the testimony in the case.
9       As an example, he told the Court here in this hearing
10  that on the day of the offense he was going home, he stopped
11  off at the Quik Stop to get some gas in his car, to buy some
12  food but he wanted to get home. And then he just happened to
13  see Mr. Soto there. Well, that was a coincidence. This is
14  Mr. Soto who is alleged to be the co-defendant in the case.
15  This is Mr. Soto with whom he's had these previous
16  discussions. And he just happens to see Mr. Soto at the Quik
17  Stop, and instead of just exchanging greetings he would have
18  the Court believe that he gets in the car or takes a walk, has
19  some other discussions with him, and then he just happens to
20  be there when the transaction occurs.
21       That just is not credible. And I think any lawyer who
22  was deciding whether to present that kind of an explanation to
23  the jury would have to think really long and hard about
24  whether that would be in the defendant's best interest. And
25  for Mr. Astorga to try to convince this court of the truth of

1  that testimony here in this hearing casts serious doubt upon
2  his credibility in every other respect.
3      With regard to Ms. Garcia, she is also affected by the
4  decision in this case.  She testified on cross-examination
5  that that's probably the most important thing to her, to have
6  Mr. Acosta Astorga back in the United States, and the only way
7  that he sees that he can do that right now is to have his plea
8  set aside.  And so she is most affected along with Mr. Astorga
9  by the verdict in this case.
10     With regard to the other witnesses in the case, the
11 Court finds them to be credible.  The Court does not find any
12 other witness to have intentionally deceived the Court.
13 However, because of the passage of time and other
14 considerations, some of the other witnesses may have faulty
15 memory about some of the details of their testimony.
16 Otherwise, the Court finds them to be credible.
17     Now, the government has submitted a proposed set of
18 findings of fact and conclusions of law.  I will go through
19 those now.  I will tell you which of those proposals I find,
20 and if I don't mention something that they propose it's
21 because it's not part of my basis for my decision.
22     The Court does find that from the date of his
23 sentencing on May the 23rd, 2001, Mr. Acosta had substantial
24 financial resources and the ability to retain counsel not only
25 for purposes of his trial, if there were to be one, but for

1  purposes of pursuing post-conviction relief, and that counsel
2  in this hearing have been effective in doing so.
3      I don't need to explain too much the reasons for that.
4  The presentence report talked about the funds that he had,
5  which as I recall was in the neighborhood of $3 million equity
6  that apparently was depleted later on.
7      The Court also finds that Mr. Acosta made no effort to
8  retain counsel to pursue post-conviction relief until sometime
9  in June or July of 2006.  He filed his petition in this matter
10 on June 16, 2007.  The Court does agree that through the
11 exercise of due diligence he could have discovered sufficient
12 facts necessary to file his petition for post-conviction
13 relief well before the time that he did so.
14     He was aware that he had been convicted of a drug
15 trafficking offense on May 23rd, 2001, when the judgment was
16 entered.  He was aware that it was probable that he would be
17 deported prior to his entry of the plea.
18     As a matter of fact, he testified here on
19 cross-examination that he, quote, knew that there was a
20 substantial probability that he was going to be deported and
21 would never be able to return to the United States, unquote.
22 He actually said that twice in his testimony here at this
23 hearing.
24     If there's any doubt about that, before his plea was
25 accepted I informed him, quote, addressing him and his

1  co-defendant, Do each of you understand that your pleas of
2  guilty in this case could result in your being deported from
3  the United States? Mr. Acosta? And then Mr. Acosta said yes.
4      Mr. Acosta was also informed by the Court at the time
5  of the entry of his plea that it could result in deportation.
6  Mr. Bennett represented Mr. Acosta from June 17th, 1999
7  through July 21st, 1999 and was familiar with the drug
8  trafficking charges against him. I am not necessarily
9  persuaded, however, that he told Mr. Acosta that his plea of
10 guilty in this case could or would result in deportation.
11     I gather that Mr. Bennett represented Mr. Acosta
12 primarily in connection with the bail hearing. The question
13 of the ultimate consequences of his plea or conviction was
14 probably premature at that time. It's a little vague to me
15 when this conversation that Mr. Bennett says he had about the
16 fact that Mr. Acosta could be deported occurred before or
17 after he entered his plea. It's most probable that it
18 occurred after he entered his plea.
19     The Court finds that the government provided discovery
20 to defense counsel that consisted of DEA reports of
21 investigation, audiotape recordings of telephone conversations
22 between Acosta and the informants, and a videotape recording
23 of Mr. Acosta meeting with the informants on June 2nd, 1999.
24     The recorded conversations were in Spanish, but the
25 government provided the defense with Spanish-English

1   translations for each of the recorded telephone conversations
2   and for the meeting on June 2nd, 1999.  Defense counsel, Ms.
3   Gilg reviewed all of that discovery.
4        After reviewing the discovery, Ms. Gilg was of the
5   opinion that the most viable defense would be the defense of
6   entrapment.  However, after they reviewed the videotape of the
7   meeting on June 2nd, 1999, Mr. Serra formed the opinion that
8   Mr. Acosta's statements and his manner of making those
9   statements in the videotape would in effect convict him out of
10  his own mouth as Mr. Serra put it.  Mr. Serra has a lot of
11  experience both preparing and trying cases with all types of
12  potential defenses including entrapment.  And after viewing
13  this tape, he formed the opinion that the defense of
14  entrapment would not be practically viable.
15       In that videotape, Mr. Acosta discussed prior drug
16  transactions in which he had been involved.  He gave detailed
17  information about the prior transactions.
18       Even though the government had provided the
19  translation, Ms. Gilg took the extra step to have an
20  independent translation and transcription prepared by Angela
21  Zawadzki.
22       It was in the spring or summer of 2000 when Mr. Serra,
23  Ms. Gilg and Mr. Schultz viewed the videotape along with Mr.
24  Acosta.  The Court finds that they must have had at least the
25  government's translation, if not their own, when they viewed

1  it because the undisputed testimony is that none of the three
2  lawyers spoke Spanish sufficiently to understand it, and the
3  Court cannot believe that they would sit there and listen to
4  something they didn't understand and then form opinions based
5  on it.
6       Based upon the totality of the evidence, not just the
7  videotape, Mr. Serra and Ms. Gilg advised Mr. Acosta that he
8  would likely be convicted following a trial and could receive
9  a sentence of at least 10 years in prison.
10      Mr. Acosta's explanation for what was on the tape was
11 that he was, as Ms. Gilg put it, puffing.  Mr. Acosta's
12 explanation was that he didn't know anything about what he was
13 saying on the tape.  He made it up based on stories that he
14 had heard in his bar from real drug dealers who talked about
15 how they did it, but that he had no personal knowledge of any
16 of that.  And that he was drunk, and when he gets drunk he
17 likes to make people happy, and he was making these men happy
18 by puffing.
19      Mr. Serra formed the opinion that if the jury heard
20 that explanation, they'd just laugh at him.  I would go a step
21 further, and I would say that the jury would likely be angry
22 at Mr. Acosta for trying to deceive them or for insulting
23 their intelligence by telling them that explanation.  To be
24 quite frank with you, I think he insults the Court's
25 intelligence when he asks the Court to believe that

1    explanation here.
2             He says, first of all, he didn't want anything to do
3    with these people, he wasn't paying any attention to what they
4    were saying.  And then he would have you believe that when he
5    gets in this meeting with them that's videotaped, he wants to
6    please them, he wants to talk to them, he wants to be their
7    friend.  It doesn't make sense.  He said that was because he
8    was drunk.  And then Ms. Garcia says that when he gets drunk,
9    that's the way he is.  I don't believe Ms. Garcia.  I believe
10   that she's been told this would be to his advantage to say
11   that he has a drinking problem and that when he gets drunk he
12   behaves this way, but I don't believe that to be true.
13            Ms. Gilg and Mr. Serra advised Mr. Acosta that if Ms.
14   Gilg could negotiate a plea bargain that would result in a
15   substantially lower sentence than 10 years that it would be in
16   his best interests to plead guilty rather than proceed to
17   trial.  Ms. Gilg did negotiate a plea agreement for Mr. Acosta
18   that would likely result in a sentence of 70 months.  She
19   advised Mr. Acosta that it would be in his best interests to
20   plead guilty under the terms of that agreement.
21            Mr. Acosta's testimony is not much different.  He
22   testified on direct examination, I believe, that he understood
23   that the length of the prison term would be 60 to 80 months.
24   More specifically he said that he understood the plea
25   agreement was that the prosecutor would recommend a sentence

1  between 60 to 80 months.  That is consistent with the plea
2  agreement, it's consistent with the sentence he received.  He
3  received a 70-month sentence.
4       This was pre-Booker as I recall, and so the lawyers
5  could be fairly confident although never reasonably -- never
6  totally certain that the judge would sentence within the
7  guidelines.
8       Under the facts and circumstances of the case, the
9  Court finds that the investigation undertaken by Ms. Gilg was
10 reasonable and within the range of competence demanded of
11 attorneys in criminal cases.
12      There was the question of the -- who was the other man
13 that was acquitted?
14      MS. GRAD:  Mr. Villa.
15      THE COURT:  There was a question of the Villa case,
16 and the fact that one of the informants who testified in that
17 case was the informant who was expected to testify against Mr.
18 Acosta in his case.  Mr. Villa was acquitted, and there's the
19 question of whether counsel should have done more in light of
20 that fact.
21      That is so speculative, however.  Notwithstanding
22 whatever the declarations say here, we all know that you can
23 never really know what goes on in jurors' minds when they
24 deliberate and arrive at a verdict in a case.  They can come
25 out and tell you that it was for this reason or that reason,

1  but you never know for sure what was really going on in their
2  minds, and sometimes they don't even know everything that's
3  going on in their minds that causes them to reach the
4  decisions that they do.
5      It is pure speculation that that conviction resulted
6  entirely from the lack of credibility of the informant.  It is
7  also even more speculative that because he was or may not have
8  been believed in another case the informant would not have
9  been believed in Mr. Astorga's case.  It would be not expected
10 for a lawyer to make those kinds of assumptions in advising
11 Mr. Acosta how to proceed, nor to be required to investigate
12 further in light of the fact that Mr. Villa was acquitted.
13     The Court does not believe Mr. Astorga's testimony
14 that they did not talk about entrapment.  The Court does not
15 believe Mr. Astorga's testimony that Ms. Gilg did not explain
16 how his plea might affect his immigration status.
17     In short, the Court does not find that anything that
18 defense counsel learned from the fact that Mr. Villa was
19 acquitted, from the fact that -- or from what Mr. Astorga told
20 them about his explanation of the tapes or from anything else
21 that was presented to them, any of that required them to do
22 further investigation before advising him that it was in his
23 best interests to plead guilty in light of the discovery they
24 received and in light of the information that they had.
25     Under the facts and circumstances, the Court finds

1  that the advice to plead guilty was reasonable and within the
2  range of competence demanded of attorneys in criminal cases.
3         The Court does not believe that Ms. Gilg promised or
4  assured Mr. Astorga that he could receive the 500-hour
5  substance abuse program. The Court does not believe his
6  testimony that she did, and the Court does not believe that
7  she would tell him that. Every lawyer knows that it's up to
8  the Bureau of Prisons, and that it's not for the judge to
9  determine, and the Court does not find that anybody promised
10 him he would receive the 500-hour substance abuse program.
11        The Court does not believe his testimony that Ms. Gilg
12 or anyone else told him he would receive the boot camp. As a
13 matter of fact, the Court does not believe he even knew about
14 the boot camp or even heard about the boot camp until he got
15 into prison. It's not something that anybody would even have
16 thought about for Mr. Astorga.
17        Mr. Astorga told the Court here that he lied to the
18 probation officer when he told her that he did not have a
19 substance abuse problem. The Court does not believe him when
20 he says that. Whether anybody has a drinking problem is a
21 subjective question. He probably drank. He didn't consider
22 it a drinking problem.
23        And it is not credible that he would lie to the
24 probation officer and tell her that he didn't have a drinking
25 problem simply because Mr. Bennett may have told him not to

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

1    talk about the drinking problem months earlier when they were
2    dealing with the question of bail.  That's just not credible.
3           And even if he did lie to the probation officer, what
4    does that do to his credibility here?  His story now is that
5    he lied to the probation officer because he thought it would
6    give him a better chance of what?  What, maybe staying out on
7    bail?  How could he have thought lying to the probation
8    officer would help him simply because Mr. Bennett told him it
9    would help him get out on bail?  But if he would lie to the
10   probation officer under those circumstances, why wouldn't he
11   lie to the Court now?
12          He tells the Court that he lied to me at the time he
13   entered his plea when he was under oath.  I don't believe he
14   did.  But if he's telling me that he would lie under oath when
15   he's looking me right in the eye face to face here in this
16   court, then is there any reason I shouldn't find that he's
17   lying to me under oath when he's looking at me through this
18   video screen?
19          The Court does not believe that Ms. Gilg told him just
20   to say whatever was necessary.  As a matter of fact, that
21   wasn't even his testimony.  His testimony was that she told
22   him just to say yes to every answer -- or to every question,
23   but he did say no to some of them.
24          He tried to tell the Court that he didn't receive a
25   copy of the plea agreement or have it read to him in Spanish

before he entered his plea. However, the record, the undisputed record unequivocally shows that he appeared before me the first time, said he hadn't had a chance to go over the plea agreement with his lawyer --

MS. GRAD: Your Honor, that's the probation report.

THE COURT: Oh, okay. Thank you.

He said to me when I asked him, Have you ever received a copy of the plea agreement and has it been read to you in Spanish, he said yes. And I said, Do you understand it? And he said yes. And the Court finds that he answered those questions correctly at the time and that his testimony otherwise here in court is not worthy of belief.

Likewise when I asked him at the time he entered his plea, I said, Did you set up the deal with the informants to sell the drugs to them, his answer was yes.

I said, All right. And then you talked to Mr. Soto about it, and the two of you talked about how the drugs would be delivered; is that right? He said yes.

I said, And then you showed up in different cars with the understanding that that's where the transaction was going to take place? And he said yes.

And then he would have the Court believe as he sits there and testifies under oath that he lied to me here in court under oath. The Court finds that what he told me the first time was correct, and that he is lying now.

1           So the Court finds that Ms. Gilg and Mr. Serra acted
2  reasonably and within the range of competence demanded of
3  attorneys in criminal cases in connection with their
4  investigation, in connection with the advice that was given to
5  Mr. Astorga regarding the immigration consequences of his
6  plea, and with respect to the sentence that he might receive.
7           Therefore, the Court concludes that Mr. Acosta's
8  motion to vacate his sentence under Section 2255 was untimely
9  because it was not filed within one year of the date upon
10 which the facts supporting the claim or claims presented could
11 have been discovered through the exercise of due diligence.
12 The Court finds that Mr. Acosta is not entitled to equitable
13 tolling or equitable estoppel against the government.
14 Therefore, the claim is untimely.
15          The Court also concludes that Mr. Serra and Ms. Gilg
16 were not ineffective in their representation of Mr. Acosta,
17 and, therefore, his claim under Section 2255 is without merit.
18 It is denied upon that ground.
19          There has been mention of coram nobis relief.  The
20 Court concludes that coram nobis relief is not available.  In
21 the event that it is available, because Mr. Serra and Ms. Gilg
22 were not ineffective in their representation of Mr. Acosta,
23 his claim under Section 1651 is likewise without merit, and it
24 is denied as well.
25          I've made findings on all the questions that were

1  presented by the government.  I've added some of my own.  Is
2  there anything else you think the Court needs to make a
3  finding upon or any conclusions of law that the Court needs to
4  address?
5           MS. GRAD:  Not for the government, Your Honor.
6           THE COURT:  All right.  Then do you need a written
7  order?
8           MS. GRAD:  Your Honor, how about if I get a transcript
9  from the Reporter, I'll order a transcript of your findings,
10 and I'll prepare a summary order to put on top of that.
11          THE COURT:  Yes.  Don't add anything of substance.  If
12 you're going to attach the transcript --
13          MS. GRAD:  That's what I'll do.
14          THE COURT:  -- just make the ruling conclusory based
15 upon the findings and conclusions made orally.
16          MS. GRAD:  I'll do that, Your Honor.
17          THE COURT:  All right.  Thank you.
18          MS. GRAD:  Thank you.
19          (Proceedings were concluded at 11:58 a.m.)
20                            ---o0o---
21
22
23
24
25

1
2        I certify that the foregoing is a correct partial
3   transcript from the record of proceedings in the
4   above-entitled matter.
5
6
7                         /s/ Kathy L. Swinhart
                          KATHY L. SWINHART, CSR #10150